**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| JAMES D. GERSON, on behalf of himself and all other similarly situated shareholders of NATIONAL RESEARCH CORPORATION, and derivatively on behalf of Nominal Defendant NATIONAL RESEARCH CORPORATION, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| MICHAEL D. HAYS, MICHAEL AND KAREN HAYS GRANDCHILDREN'S TRUST, DONALD M. BERWICK, JOANN M. MARTIN, BARBARA J. MOWRY, JOHN N. NUNNELLY, | ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| NATIONAL RESEARCH CORPORATION, | ) ) |
| Nominal Defendant. | ) ) |

Case No. _____

**VERIFIED SHAREHOLDER**
**CLASS ACTION AND DERIVATIVE COMPLAINT**

Plaintiff James D. Gerson ("Plaintiff"), on behalf of himself and all other similarly situated holders of Class B common stock of National Research Corporation ("NRC" or the "Company"), and derivatively on behalf of nominal defendant NRC, alleges as follows:

**SUMMARY OF THE ACTION**

1.      This case arises out of an extreme and illicit power grab by NRC's founder, CEO, and controlling shareholder Michael D. Hays ("Hays").  Hays is causing NRC to spend more than $102 million that the Company does not have to force a repurchase of NRC's "high-vote" Class B stock so that Hays can have supermajority control of NRC.  The proposed transaction,

1

which Plaintiff seeks to enjoin: (i) is illegal under the Wisconsin Business Corporation Law;[1] (ii) entrenches Hays by increasing his combined voting power from 54% to 92%; (iii) unfairly provides Hays and his family members other benefits not shared by minority shareholders; (iv) harms NRC by requiring it to increase its debt load by more than 40 times and deplete virtually all of the Company's cash on hand; and (v) harms unaffiliated holders of Class B stock, such as Plaintiff, by compelling the repurchase of their shares at an unfair price.

2.      NRC is a so-called "dual-class" company with two classes of publicly-traded common stock: Class A stock ("Class A Stock") and Class B stock ("Class B Stock"). Shares of Class B Stock carry 100-times the voting power of Class A Stock, and are entitled to six-times the amount of any dividend paid on any share of Class A Stock. Hays holds 26% of the Class A Stock and 56% of the Class B Stock, providing him with a majority (approximately 54%) of the Company's combined voting power.

3.      In late-September 2017, the Company announced that its board of directors (the "Board") had approved a proposed stock reclassification (the "Proposed Transaction"), under which the Company would repurchase all of the outstanding shares of Class B Stock—other than the shares held by Hays—for $53.44 in cash (the "Repurchase"). Following the Repurchase, the Class B shares will be delisted and no longer trade on a public exchange. All Class B shares not held by Hays will also be retired, and Hays will become the only holder of the approximately 1.76 million shares of Class B Stock that remain. This will give Hays more than 92% of the Company's voting power. The Company will spend approximately $101 million to undertake the Repurchase, which will be financed through approximately $31 million in cash on

---

[1] NRC is headquartered in Nebraska but is incorporated in Wisconsin. Because Plaintiff's claims concern the "internal affairs" of NRC, "the law of the state of incorporation," *i.e.,* Wisconsin law, governs Plaintiff's claims. *See, e.g., First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 621 (U.S. 1983).

hand and a new, $70 million, term loan.  After other expenses, including the reimbursement of more than $500,000 of Hays's personal expenses, the Proposed Transaction will cost the Company more than $102 million.   The Proposed Transaction is subject to a shareholder vote expected to be held in the coming weeks, but the outcome of that vote will be controlled by Hays and his family trust's combined voting power.

4.     The Proposed Transaction violates section 180.0640 of the Wisconsin Business Corporation Law, which prohibits any distribution to shareholders, including any stock repurchase, if, after the distribution, the Company's total liabilities would exceed the Company's assets.  NRC has conceded in its public filings that the Repurchase will cause the Company to have a "negative amount of shareholders' equity," and even a cursory review of NRC's balance sheet reveals that the Repurchase will leave the Company with total liabilities in excess of the Company's total assets.

5.     As importantly, the Proposed Transaction is a plainly disloyal attempt by Hays to entrench himself as NRC's controlling shareholder at great expense to the Company and its minority shareholders. Hays and his family members are also receiving gratuitous economic benefits not shared by minority shareholders.  Hays's faithless abuse of the Company and its resources is simply not permissible under the law.

6.     Class B shareholders are also suffering direct harm.  The Repurchase will cash-out unaffiliated shareholders at a price *below* the market price of Class B shares on the day the Board approved the Proposed Transaction.

7.     The preliminary proxy statement issued in connection with the Proposed Transaction (the "Proxy") describes the hopelessly unfair process that led to the Proposed Transaction.   The Board knowingly and willfully failed to implement a single procedural

3

protection designed to protect the interests of the Company or its shareholders. The Board allowed Hays to: (i) lead the process, (ii) participate in Board deliberations and discussions, and (iii) ***vote to approve the Proposed Transaction***. The Board did not have a financial advisor or receive a fairness opinion. The Board consulted only with the Company's, *i.e.,* Hays's, legal counsel, and the Proxy—in apparent recognition of the obvious conflict—is careful not to say that counsel actually advised the Board. The Board also never sought to negotiate with Hays. The purportedly independent members of the Board also harbor conflicts because each has a direct financial interest in the Proposed Transaction as a result of their decision to accelerate their unvested options and restricted stock in connection with the Proposed Transaction.

8.     Plaintiff—who is a significant shareholder of NRC and owns greater than two percent (or nearly $20 million) of both the Company's Class A and Class B shares—brings this action in the first instance to enjoin the Proposed Transaction and prevent Hays and the Board from irreparably harming the Company and its shareholders.

9.     If not enjoined, the Proposed Transaction—which violates black-letter Wisconsin Business Corporation Law—will set in motion a fundamental change of the Company's capital structure, including the delisting and retirement of publicly-traded securities. Holders of Class B shares will permanently lose their associated voting power. The Proposed Transaction cannot be unwound, and the resulting harm to the Company and its shareholders cannot be adequately or fully compensated through an award of money damages.

10.     Plaintiff also seeks to recover damages on behalf of both the Company and its Class B shareholders, regardless of any injunction. The Company has already been harmed as a result of the Proposed Transaction, including by having been forced to incur approximately $1 million in transaction-related expenses, including the reimbursement of Hays's personal

expenses.  In the event the Transaction were not enjoined, Plaintiff will also seek to recover for: (i) additional harm to the Company resulting from Proposed Transaction and Repurchase, which damages will exceed $100 million; and (ii) harm to minority holders of Class B Stock, whose shares are being cashed-out at an unfair price.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the value of the amount in controversy excludes $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12.     Venue is proper in this District as a substantial part of the acts and omissions giving rise to the claims in this action occurred in this District, and certain of the Defendants reside in and/or have their principal place of business within this District.

## PARTIES

13.     Plaintiff James Gerson is, and at all relevant times has been, a holder of both Class A and Class B Stock.  Plaintiff currently holds 458,100 shares of Class A Stock and 76,350 shares of Class B Stock, or approximately 2.18% and 2.15% of each class, respectively.  Plaintiff is a citizen of New York.

14.     Defendant Michael D. Hays ("Hays") founded NRC in 1981 and has served as its CEO and as a Board member continuously since that time.  He holds approximately 26% of the outstanding shares of Class A Stock and approximately 56% of the outstanding shares of Class B Stock.  Hays's shares give him approximately 54% of the Company's total voting power.  Hays is a citizen of Nebraska.

15.     Defendant Michael and Karen Hays Grandchildren's Trust (the "Hays Family Trust") was established by Hays and his wife for the benefit of their grandchildren.  The Hays Family Trust holds approximately 28% of the outstanding shares of Class A Stock and approximately 3.5% of the outstanding shares of Class B Stock.  The Hays Family Trust's shares give it approximately 5% of the Company's total voting power.

16.     Defendant Donald M. Berwick ("Berwick") has been a director of NRC since October 2015.  Berwick is a citizen of Massachusetts.

17.     Defendant JoAnn M. Martin ("Martin") has been a director of NRC since June 2001.  Martin is a citizen of Nebraska.

18.     Defendant Barbara J. Mowry ("Mowry") has been a director of NRC since May 2014.  Mowry is a citizen of Colorado.

19.     Defendant John N. Nunnelly ("Nunnelly") has been a director of NRC since January 2005.  Nunnelly is a citizen of Massachusetts.

20.     Nominal Defendant NRC is primarily engaged in the provision of data analytics and consulting services in the health-care industry.  The Company is incorporated in Wisconsin.  Its principal offices are located at 1245 Q Street, Lincoln, Nebraska.  The Company's Class A Stock and Class B Stock are each publicly-traded on the NASDAQ Global Market ("Nasdaq"), under the ticker symbols "NRCIA" and "NRCIB," respectively.

21.     Defendants Hays, Berwick, Martin, Mowry, and Nunnelly are collectively referred to herein as the "Director Defendants."  The Director Defendants and the Hays Family Trust are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

I.      **Background of NRC and Its Dual-Class Stock Structure**

22.     NRC is a Nebraska-headquartered Wisconsin corporation that was founded by Hays in 1981.  It is a leading provider of data analytics and consulting services in the health care industry.

23.     A substantial portion of NRC's business consists of subscription-based services that capture and analyze data concerning, *inter alia*, patient satisfaction, community perceptions, and physician engagement.

24.     NRC has two classes of common stock that trade on the Nasdaq:  Class A Stock and Class B Stock.

25.     The dual-class structure results from a recapitalization in May 2013 (the "2013 Recapitalization"), in which the Company converted its then-single class of common stock into two classes.  Pursuant to the 2013 Recapitalization, holders of the Company's then-outstanding common stock received three shares of Class A Stock and one-half of one share of Class B Stock in exchange for each then-existing share of common stock.

26.     Class A Stock and Class B Stock have different voting and dividend rights pursuant to NRC's Amended and Restated Articles of Incorporation (the "Charter").  Holders of Class A Stock receive 1/100th of a vote per share and the right to receive 1/6th of any dividend paid on shares of Class B Stock.  Holders of Class B Stock receive one vote per share and the right to receive six times any dividend paid on shares of Class A Stock.

27.     Hays specifically modeled the 2013 Recapitalization after the dual class structure Warren Buffett implemented at Berkshire Hathaway Inc. As Hays explained to stockholders in 2013, the 2013 Recapitalization would "do no harm" to shareholders, and "following the Berkshire example of its Baby B's (as many call their new shares), our new class of shares will

7

have far less voting power and will receive only a fractional amount of any divided payments that may be paid." As with Berkshire's two classes of common stock, the trading activity of NRC's two stock classes has reflected their disparate voting and dividend rights. Class A Stock trades at a discount to Class B Stock given Class A's subordinate voting and dividend rights. Class A, however, is also more liquid than Class B Stock, a reflection of, among other things, the fact that there are five times as many shares of Class A Stock outstanding as there are shares of Class B Stock.

## II.   Hays's Control of NRC

28.     In addition to founding NRC and serving as its CEO and as a Board member since that time, Hays is NRC's majority, controlling shareholder. Hays holds approximately 26% of the outstanding shares of Class A Stock and approximately 56% of the outstanding shares of Class B stock, giving him approximately 54.1% of the Company's total voting power. NRC acknowledges in its public filings, including the Proxy, that Hays is the Company's controlling shareholder.

29.     The Hays Family Trust, which Hays and his wife established for their grandchildren, is also a significant shareholder of the Company, holding approximately 5% of the Company's total voting power. The Hays Family Trust holds approximately 28% of the outstanding shares of Class A Stock and approximately 3.5% of the outstanding shares of Class B Stock.

30.     The Hays Family Trust received all of its shares of both Class A and Class B Stock from Hays and his wife. The Hays Family Trust's holdings are also important to Hays's control of NRC, because those holdings ensure that Hays controls a majority of the voting power of Class A Stock. The Company's Charter requires approval from a majority of stockholders

within each class before certain corporate actions may be undertaken, including the Proposed Transaction that Plaintiff is challenging through this action.

31.     Hays and the Hays Family Trust collectively own and control 54% of the total voting power of Class A Stock.

### III.    NRC Announces the Proposed Transaction

32.     On September 18, 2017, NRC announced that its Board had approved the Proposed Transaction, pursuant to which the Company will repurchase all shares of Class B Stock, other than shares held by Hays, for $53.44 in cash per share, or for a total of approximately $101 million. After the Proposed Transaction, Hays will hold 100% of the outstanding shares of Class B Stock, which will carry the same super-voting and dividend rights as before the Proposed Transaction. Class B shares will be delisted from the Nasdaq and no longer publicly trade.  The Company will retire the Class B shares not held by Hays.

33.     The Proposed Transaction will be accomplished in three steps: (i) a reverse split of Class B shares (the "Reverse Split"); (ii) the Repurchase of all Class B shares not held by Hays; and finally (iii) a forward split of Hay's Class B shares (the "Forward Split").

34.     On the effective date of the Proposed Transaction, the Company will immediately effect the Reverse Split at a ratio of 1-for-1,764,560 shares of Class B Stock.  Because Hays will hold 1,764,560 shares of Class B stock immediately before the Reverse Split, Hays will hold one share of Class B Stock after the split. All other Class B shareholders will hold fractional shares.

35.      The Company will then undertake the Repurchase, paying each shareholder holding a fractional share $53.44 in cash multiplied by the number of Class B shares he or she held immediately prior to the Reverse Split. Hays will retain his one share, which will not be repurchased. The Company's Class B Stock will then be de-listed from the Nasdaq. The Company will also retire the fractional Class B shares.

36.    Hays will then be the sole participant in the Forward Split, which will split his one share of Class B Stock into 1,764,560 shares.  Hays's Class B holdings with therefore be restored to the identical number of shares of Class B Stock that he held prior to the Reverse Split, except Hays will hold 100% of the outstanding Class B shares.

37.    As explained in more detail below (*see* Section V.A, *infra*), Hays and his family members are the beneficiaries of the Proposed Transaction.  Hays currently holds a 40.8% economic stake in the Company and controls 54.1% of the Company's voting power.  After the Proposed Transaction, he will hold a 51.9% economic interest and control 92.3% of the Company's total voting power.  The Proposed Transaction was also structured so that Hays could transfer Class B shares to the Hays Family Trust immediately before the Transaction, resulting in them receiving over $11 million (or greater than 10%) of the transaction proceeds.

38.    Though the Proposed Transaction is effectively a management buyout of Class B shares for the benefit of Hays and his family members, the Company is paying the entire cost.

39.    The Company will finance the Proposed Transaction through a combination of cash and debt.  The Company will use approximately $31 million of cash on hand to make the Repurchase, and will fund the remainder of the Repurchase through a $70 million, five year term loan provided under a new credit facility with First National Bank of Omaha ("FNB").  The cost of the Repurchase is $101 million.  The total cost of the Proposed Transaction—which includes reimbursement of Hays's personal expenses (*see* Section V.A, *infra*)—will be approximately $102,175,000.[2]

40.    The Proposed Transaction is subject to a series of stockholder votes.  Under Wisconsin law and the Company's Charter, three voting groups must independently approve the

---

[2] Approximately 7%, or $7.5 million of the Proposed Transaction cost, relates to outstanding options and restricted stock awards that the Board determined to accelerate.

Proposed Transaction by a majority vote: (i) the Class A Stock and Class B Stock voting together as a group; (ii) the Class A Stock voting independently; and (iii) the Class B Stock voting independently.  Hays controls the outcome of all three votes.  Hays owns a majority of the Class B Stock and a majority of the voting power of Class A and Class B voting together.  Hays and the Hays Family Trust collectively own a majority of the Class A Stock.  The Board determined *not* to condition the Proposed Transaction on approval by a majority of unaffiliated shareholders because, as explained below, Hays and the Board want to ensure that NRC's minority shareholders cannot reject the Proposed Transaction.

## IV.    The Proposed Transaction Must Be Enjoined Because the Repurchase is an Unlawful Distribution to Shareholders That Violates the Wisconsin Business Corporation Law

41.    As an initial matter, the Proposed Transaction violates the Wisconsin Business Corporation Law, Wis. Stat. § 180.0640, which prohibits any distribution to shareholders, including a repurchase of shares, that would cause a company's liabilities to exceed its assets. Section 180.0640 governs "Distributions to shareholders,"  which section 180.0640(7) defines as "a direct or indirect transfer by a corporation of money . . . to or for the benefit of its shareholders in respect of any of its shares,[3] including but not limited to . . . [a] *purchase*, redemption, *or other acquisition of shares*." (emphasis added).   Section 180.0640 (3)-(b) expressly provides that "[n]o distribution may be made if, after giving it effect . . . [t]he corporation's total assets *would be less than the sum of its total liabilities* . . . ." (emphasis added).

42.    Under 180.0103(7)-(b), the Proposed Transaction is a distribution, because its central feature is the Repurchase of all Class B shares other than those held by Hays.  *See* Proxy

---

[3] Section 180.0640 (15) defines "Shares" as "the units into which proprietary interests in a corporation are divided," and therefore includes both whole and fractional shares.

at, *e.g.*, 15 ("…we will ***repurchase*** the resulting fractional shares held by each shareholder with less than one share of Class B common stock after the Reverse Split…") (emphasis added). Further, as the Company expressly concedes in the Proxy, the "Proposed Transaction will result in [NRC] having, on a pro forma basis, ***a negative amount of shareholders' equity***," *i.e.,* the Company's total assets will be less than its total liabilities.  Proxy at 25 (emphasis added).   As a result, Section 180.0640 of the Wisconsin Business Corporation Law facially prohibits the Proposed Transaction.

43.    The Company's concession aside, the Company's other financial disclosures confirm that the Proposed Transaction violates Section 180.0640.

44.    According to the Company's most recent 10-Q, as of September 30, 2017, the Company had total assets of $129 million and total liabilities of approximately $40 million. Shareholders' equity, or total assets minus total liabilities, equaled $89 million.  To fund the repurchase of Class B shares, the Company will spend $31 million in cash, thus ***decreasing*** its total assets to $98 million. The Company will also take out a $70 million loan, thus ***increasing*** total liabilities to $110 million.  Shareholders' equity will be ***negative*** $12 million.

45.    Because the Proposed Transaction violates the Wisconsin Business Corporation Law, it is unlawful and must be enjoined.

## V.    The Proposed Transaction Is An Unfair Giveaway to Hays and His Family Members

### A.    The Proposed Transaction Cements Hays's Control and Hands Him and His Family Other Significant Benefits in Exchange for No Consideration

46.    The Proposed Transaction is an extreme windfall for Hays.  As noted above, after the Repurchase of minority shareholders' Class B shares, Hays will go from having a bare majority (54.1%) of the Company's voting power to having supermajority (92.3%) control.

12

Because Hays will hold 100% of the Class B shares, his control will be perpetual unless he determines to sell the Company.

47.     Hays and his family members are also receiving substantial financial benefits not shared by other stockholders of the Company.

48.     *First*, Hays's economic interest in the Company will increase significantly, from 40.8% to 51.9%.  He will therefore receive an even greater percentage of future dividends paid by the Company,[4] and will be entitled to an even greater percentage of the proceeds of any merger or sale.

49.     *Second*, Hays is also causing the Company to pay his family members $11.1 million as part of the Proposed Transaction through an unfair side agreement.  Specifically, Hays and the Hays Family Trust have agreed that, prior to the Reverse Split, Hays will transfer 208,645 shares of Class B Stock to the Hays Family Trust in exchange for an undisclosed "equivalent value amount of shares of class A common stock" (the "Stock Swap").  If the Class B Stock subject to the Stock Swap were held by Hays at the time of the Reverse Split, those shares would not be eligible to receive the $53.44 per share cash payment.  Because those shares will be held by the Hays Family Trust at the time of the Reverse Split, the Hays Family Trust will receive a $53.44 per share payment on 208,645 additional shares of Class B Stock, totaling approximately $11.1 million. This $11.1 million payment to the Hays Family Trust is more than 10% of the total amount being paid by the Company in connection with the Proposed Transaction. Despite the Proxy's description of the Stock Swap as "incidental to . . .  the

---

[4] The Proxy states the Company will "continue with our current dividends. . . ."  But for the same reason that the Proposed Transaction and Repurchase are unlawful under section 180.0640 of the Wisconsin Business Corporation Law, the Company could not lawfully pay dividends after the Repurchase, even assuming the Company can lawfully undertake the Repurchase in the first instance (which it cannot).

Proposed Transaction," it is clear that the Proposed Transaction was specifically structured to accommodate the payment to the Hays Family Trust.  Indeed, the Reverse Split ratio, 1-for-1,764,560 shares, recognizes the exact number of Class B shares Hays will hold *after* he transfers 208,645 of his Class B shares to the Hays Family Trust pursuant to the Swap.

50.     *Third*, and finally, adding insult to injury, the Company is also repaying $538,000 of "personal expenses" Hays purportedly incurred in connection with the Proposed Transaction process.  The Proxy does not explain the source of these expenses, or why the Board believed it remotely appropriate to cover expenses incurred in Hays's personal capacity in connection with a transaction that benefits only Hays.

**B.     The Proposed Transaction Harms NRC Financially, Saddling the Company With Substantial Debt and Depleting Virtually all of Its Cash on Hand**

51.     The Proposed Transaction will also cause substantial financial harm to the Company.  The Company is spending more than $102 million that it simply does not have in order to finance a transaction that, as described above, benefits only Hays and his family members.

52.     Presently, NRC is a virtually debt-free company.  As of September 30, 2017, the Company had no long-term debt and total outstanding indebtedness of only $1.7 million.  As of the same date, the Company had a little less than $36 million of cash on hand.

53.     To pay for the Proposed Transaction, NRC will increase its outstanding indebtedness *by more than 40 times*, through the $70 million term loan from FNB.  As the Proxy explains, the Company's "increased level of indebtedness could adversely affect [its] financial condition and results of operations," including because the Company will be "required to dedicate a portion of [its] cash flows from operations to repayment of debt, limiting the

14

availability of cash for other purposes. . . ."  The Proxy's assertion that the Proposed Transaction results in the Company incurring only "a moderate debt burden," is plainly false.

54.     The Company is also depleting virtually all of its cash on hand.  After the Proposed Transaction, the Company will have less than $5 million in cash.

55.     The $102 million-plus the Company will spend approximates or exceeds the Company's average annual revenues over the last five fiscal years.[5]  It also exceeds by a factor of five the Company's average annual net income over the last five fiscal years.[6] Most egregiously, it exceeds the Company's **combined profit over the last five fiscal years**.  The Company is essentially taking more than a half-decade's worth of profit and spending it to benefit Hays.

56.     Finally, the Company and its minority shareholders are already feeling the impact of the Proposed Transaction, even though it is not yet complete.  For example, as the Company explained in a Form 8-K filed with the SEC on November 7, 2017, for the quarterly period ended September 30, 2017, the Company's "operating income . . . was offset by approximately $975,000 in expenses for" the Proposed Transaction. These expenditures reduced the Company's quarterly profit by more than 20%.

**C.      Class B Shareholders Are Being Forced Out of the Their Investments At an Unfair Price**

57.     The Proposed Transaction is also unfair to holders of Class B Stock. Year-to-date, the price of Class B shares has increased by more than 30%.  Instead of continuing to participate in the stock's upward momentum, holders of Class B Stock will be cashed out.  Worse, they will be cashed out for a price, $53.44 per share, that is a **discount** to the market price of Class B

---

[5] In the last five fiscal years, NRC has reported annual revenue of approximately $109.3 million, $102.3 million, $99.5 million, $92.5 million, and $86.4 million, respectively.

[6] NRC has reported annual net income of approximately $20.5 million, $17.6 million, $18.1 million, $15.4 million, and $15.0 million for the last five fiscal years, respectively, for a total of $86.6 million.

Stock at the market's open on September 15, 2018, *i.e.,* the day the Board approved the Proposed Transaction.[7]  In other words, shareholders could have received a higher price for their shares on the open market than they will receive through the Repurchase.

58.     As explained below, the Board made virtually no effort to determine if the Repurchase price was fair, including by failing to retain an independent financial advisor, and by failing to procure a standard fairness opinion or other valuation.  The Proxy claims the Board did not consider, for example, a discounted cash flow valuation "because of the subjective assumptions that would be involved in such an approach," even though the $53.44 Repurchase price is itself based on, at best, a subjective determination by the Board.  The Proxy also claims that hiring a financial advisor would have been too expensive, yet the more than half-a-million-dollars in Hays's personal expenses the Board reimbursed easily exceeds the cost of a financial advisor.

59.     Hays and the Board have also failed to disclose to Class B Stockholders plainly material information regarding the value of their shares, including cash flow projections of Company management.  Courts have held that such projections are "among the most highly-prized disclosures," *In re Netsmart Technologies, Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007), and of "obvious materiality" to shareholders who are being cashed out, as is the case here.  *In re PNB Holding Co.*, 2006 WL 2403999, at *15 (Del. Ch. 2006).

60.     Minority shareholders that hold Class B Stock and Class A Stock will also lose any meaningful say in the Company's affairs.[8]   Those shareholders' voting power combined, presently, is over 35%.  Hay's entrenchment drops that number to approximately 5%.  As the

---

[7] Cynically, the Proxy states that if Class B Shareholders want to "participate in future increases in the value of the Company" they can "purchas[e] our class A common stock. . . ."

[8] Holders of only Class B shares will obviously lose all of their voting power in the Company.

Proxy makes clear, once minority shareholders' Class B Stock is repurchased, those shares will be delisted and then retired, meaning the Proposed Transaction would be virtually impossible to undo.

**D.    Class A Shareholders Will Be Harmed By Hays's Entrenchment and Their Rights Under the Charter Will be Violated**

61.    Minority holders of Class A Stock are also harmed by the Proposed Transaction. As explained above, the Proposed Transaction provides Hays absolute and perpetual control of the Company.  The market clearly realizes the negative impact of that control, and has already begun discounting the price of Class A Stock.  As of the last trading day before the filing of this Complaint, the price of Class A shares had fallen by more than 8% since their close on September 15, 2018 (*i.e.,* the last trading day before the announcement of the Proposed Transaction).

62.    Further, the Proposed Transaction violates Class A shareholders' rights under the Charter.  The Charter is a contract among the Company, the Board, and the Company's shareholders.  NRC's Charter provides that, apart from voting and dividend rights, the two classes of common stock are to be treated equally.  Article 2(B)(1) sets forth an "equal status" provision (the "Equal Status Provision"), according to which Class A Stock and Class B Stock "shall have the same rights and privileges and shall rank equally, share ratably and be identical in all respects as to all matters...."  Additionally, Article 2(B)(4) provides that "no class of Common Stock may be reclassified, subdivided or combined unless the reclassification, subdivision or combination occurs simultaneously and in the same proportion for each outstanding class of Common Stock."

63.    Because holders of Class A stock will not receive any cash payment, the Proposed Transaction violates the Equal Status Provision in the Charter.  Indeed, the Proxy is clear that

17

Hays is causing an amendment of the Charter in order to circumvent that provision.  Hays's and the Board's flouting of the Charter is plainly bad faith.

64.     Notably, despite circumventing the Equal Status Provision, the Proxy claims the Class B shares that Hays will hold after the Proposed Transaction will "continue to be subject to the 'equal status' provision of our" Charter, which the Proxy claims will "cap[] the value per share of the class B common stock in any distribution of property, merger, consolidation, purchase or acquisition of property or stock, asset transfer, division, share exchange, recapitalization, reorganization, or similar corporate transaction at the value per share received by holders of class A common stock . . ."  No Class A shareholder could possibly rely on this statement. Hays and the Board have circumvented the Equal Status Provision in the Proposed Transaction. Holders of Class A Stock can therefore only reasonably expect that Hays will circumvent the Equal Status Provision again in the future.

### E.     Hays and the Board Have Refused to Condition the Proposed Transaction on Approval by a Majority of Unaffiliated Shareholders

65.     While Hays and the Board claim that the Proposed Transaction was designed, in part, to address shareholder concerns (*see* § V.G, *infra*), they are not allowing shareholders to decide whether to accept or reject the Proposed Transaction.

66.     The Proposed Transaction will be submitted only to three perfunctory votes that Hays and his family members control: a vote of Class A Stock and Class B Stock voting together as a group, and a vote of each class voting independently.  The Board had the ability to condition the Proposed Transaction on the affirmative vote of minority shareholders, but affirmatively chose not to do so.

67.     The Proxy says the Board determined that "allowing a minority of investors to make a determination with respect to the Proposed Transaction alone would not be in the best

18

interests of the Company and the shareholders," including because, supposedly, the "Board was . . . concerned that shareholders representing disproportionately few shares could unduly influence the vote, especially if minority shareholder participation in the voting were limited." This is hogwash.

68.     Excluding minority shareholders from meaningfully participating in the Proxy vote only *ensures* that "disproportionately few shares" *i.e.,* Hay's shares, will "unduly influence the vote . . ." It should be abundantly clear that the Board recognizes that minority shareholders view the Proposed Transaction as unfair and would likely reject it. The Proxy even specifically notes that the Board rejected at least one alternative transaction structure—a tender offer— because of its "voluntary nature."

69.     The Board is simply unwilling to jeopardize a transaction that benefits Hays.

**F.     The Board Process Leading to the Proposed Transaction Lacks a Single Indicia of Fairness**

**1.     Hays Initiated the Proposed Transaction and the Board Permitted Hays To Participate in Its Process**

70.     Given Hays's obvious conflict of interest, any properly functioning board of directors would have excluded Hays completely from its process, including all Board deliberation and voting. The Proxy, however, is clear that the Board did not do that. The Proxy concedes that Hays "led" the Board's "evaluation" and "had a role in electing to pursue the Proposed Transaction and structuring its terms." Hays was present for, and participated in, a majority of the Board's meetings, including the Board meetings leading up to approval of the Proposed Transaction—on August 1, August 5, August 21, and September 15, 2017. Hays also did not recuse himself from the Board's vote on September 15, 2017. Nor did the Board even discuss whether Hays should have been recused from the vote (he should have been).

19

### 2.     The Board Did Not Form a Special Committee

71.     The Board compounded its failure to address and manage Hays's conflicts of interests by failing to take the very rudimentary step of forming a special committee of the Board, comprised of disinterested and independent directors.   The absence of a special committee meant the Board lacked any ability to deal with Hays at arm's-length or evaluate the Proposed Transaction free from Hays's influence. The Proxy claims that the Board did not even discuss forming a special committee until May 2017 (*i.e.,* many months after the Proposed Transaction process began) and then "concluded there were already sufficient procedural safeguards in place . . . ."   As explained above and below, no procedural protections were ever put in place.

### 3.     The Proposed Transaction Was Not Negotiated

72.     The Proxy is clear that the Board never sought to negotiate a single term of the Proposed Transaction with Hays.  Nor did the Board negotiate the related Stock Swap, or the reimbursement of Hays's personal expenses.  The only negotiation described in the Proxy is between the Board and FNB.  The Board's failure to even attempt to engage in any sort of bargaining—let alone arm's-length bargaining with Hays—reflects a complete and utter failure by the Board to protect the interests of the Company and its shareholders.

### 4.     The Board Did Not Request or Receive a Fairness Opinion

73.     The Board likewise failed to take the very basic procedural step of hiring a financial advisor to evaluate the Proposed Transaction and determine whether it was fair.  As the Proxy states: "The Company did not receive a report, opinion or appraisal from an outside party as to the fairness of the Proposed Transaction to holders of our class A common stock, [or] holders of our class B common stock who will be cashed out as a result of the Proposed Transaction. . . ."  Nor did a financial advisor assess the "the value of the class B common stock"

20

that is being repurchased.  The Proxy attempts to explain away this obvious failure by stating the "independent members of the Board concluded that there were already sufficient procedural safeguards without the expense of retaining an independent fairness advisor."  Again, the Proposed Transaction lacks any procedural safeguards.  Moreover, the Board's concerns regarding "expense" are plainly disingenuous. The Board is reimbursing Hays's personal expenses of over half-a-million-dollars.  The Board could easily have hired a reputable financial advisor and procured fairness opinion for significantly less than that amount.  The Board's explanation for failing to ensure the fairness of the Proposed Transaction is simply not credible.

5.      **The Board Did Not Retain a Financial Advisor to Explore the Company's Alternatives, Including By Conducting a Market Check**

74.      The Board further failed to ensure the fairness of the Proposed Transaction by failing to solicit third-party interest for the Class B shares.  While the Proxy is clear that Hays rejected virtually every alternative to the Proposed Transaction, including a sale of the Company or tender offer, the Proxy never explains why the Board did not conduct a simple market check. That the Board failed to determine what willing third-parties would pay for the Class B shares demonstrates a further failure by the Board to ensure that the Proposed Transaction is fair to the Company or its minority shareholders.

6.      **The Board Did Not Seek or Receive the Advice of an Independent Legal Advisor**

75.      The Board likewise failed to retain an independent legal advisor.  The Board merely had various discussions with Foley & Lardner LLP ("Foley"), which is "***the Company's*** long-standing outside corporate and securities counsel" *i.e.,* is Hay's counsel, and whose relationship with Hays dates back to ***at least*** 1997 when Foley took Hays's Company public. Beyond the obvious conflict posed by Hays's longstanding relationship with Foley, Foley was further conflicted because Hays—as CEO, Chairman, and controlling shareholder of NRC—

21

determines whether NRC will remain a client of Foley, and thus whether Foley will continue to receive legal fees from NRC in the future.  Foley receives other benefits from its relationship with NRC, including its ability to advertise to potential clients the firm's relationship with NRC.  Indeed, Foley's website currently touts as experience its representation of NRC in connection with the 2013 Recapitalization.

76.     Foley likely recognizes that its conflicts of interest precluded it from advising the Board.  The Proxy is careful to never say that Foley advised the Board, and instead refers to the Board merely having "convened with Foley" and having "met . . . with representatives of Foley . . . ."  The Board is misleading shareholders into believing that Foley advised it.

### 7.     NRC's Audit Committee, In Violation of Its Charter, Failed to Oversee or Approve the Proposed Transaction

77.     Leaving aside the Board's failure to establish a special committee, the Board also failed to delegate transaction oversight and approval to the Audit Committee of the Board.  The Audit Committee's charter requires that the committee "[a]pprove all related party transactions to the extent required by the rules of Nasdaq," which rules required Audit Committee "review and oversight . . . ."  The Audit Committee's only role in connection with the Proposed Transaction was to approve the Company's reimbursement of Hays's $538,000 in personal expenses.

### 8.     Every Member of the Board Harbored a Material Conflict of Interest as a Result of Their Direct Financial Interest in the Proposed Transaction

78.     The Board's process is further impugned by the fact that each of the four purportedly independent members of the Board—Nunnelly, Martin, Mowry, and Berwick[9]—has a direct, personal financial interest in the transaction.  Each director voted to accelerate vesting

---

[9] At the time the Board approved the Proposed Transaction, the Board consisted of these five directors: Nunnelly, Martin, Mowry, Berwick, and Hays.

of his or her unvested options and restricted Class B Stock immediately before the Proposed Transaction such that all of their unvested options and restricted shares would be paid out as if they were common shares of Class B Stock being acquired through the Repurchase.

79.     As a result of their decision, Nunnelly will receive $1,039,680; Martin will receive $619,020; Mowry will receive $375,780; and Berwick will receive $275,880. The Proxy does not reflect consideration by these directors of their own conflicts of interest.  Rather, the Proxy simply repeatedly refers to these directors as "independent."

**G.     The Board's Purported Reasons for Undertaking the Proposed Transaction Simply Do Not Add Up**

80.      Because the Proposed Transaction represents such an obvious giveaway to Hays, the Board has attempted to rationalize the Proposed Transaction as conceived primarily to: (i) address supposed "confusion and shareholder concerns regarding the Company's dual class common stock structure"; (ii) "[p]rovid[e] a cost-effective liquidity event for shareholders . . . ."; and (iii) "increas[e] liquidity in [the Company's] class A common stock. . . ."   The Proxy also claims that Hays is retaining his Class B stock, not to secure virtually absolute control of NRC, but solely so that the Company can maintain a "moderate debt burden."  This is clear pretext that does not withstand even minimal scrutiny.

81.     *First*, the Proposed Transaction ***does not eliminate NRC's dual-class structure***, and therefore could not possibly address any purported shareholder "confusion" or "concern." As explained above, if the Proposed Transaction is consummated, Hays's Class B shares will remain outstanding, continue to hold 100 times the voting power of Class A Stock, and continue to be entitled to a six-times higher dividend than Class A shares.  Further, claims of current shareholder concern and confusion are dubious.  The Proxy does not identify any shareholder that has expressed concern or confusion. The Proxy only obliquely references "certain

23

communications from institutional shareholders" that supposedly occurred more than two years ago, and which the Board discussed at an October 2015 Board meeting. The Proxy does not disclose any such similar communications since that time, nor explain why the Board would act in October 2017 to address concerns expressed by shareholders in October 2015.

82.    Further, if the Proposed Transaction were truly an effort to address legitimate shareholder concerns, then the Board would allow shareholders—other than Hays and his family members—to have a say in whether the transaction is effectuated. Instead, as noted above, the vote is controlled by Hays and the Hays Family Trust, as the Board has refused to condition the transaction on approval by a majority of unaffiliated shareholders.

83.    *Second*, the "liquidity event" the Board has touted is an illusory benefit. Thousands of shares of Class B Stock trade on the open market each day. Indeed, the run-up in the price of Class B Stock over the past year belies any suggestion that Class B shareholders could not realize value for their shares but for the Proposed Transaction. Nor is there any indication that Class B shareholders currently wish to liquidate their holdings. Further, the Proposed Transaction is not "cost-effective." Because Class B shareholders will receive cash for their shares, it has significant tax consequences for investors.

84.    *Third*, the supposed increased liquidity that Class A shareholders will experience is not supported by any evaluation or analysis contained in the Proxy. As noted above, the Board did not retain an independent financial advisor, nor did the Board otherwise conduct any evaluation of the expected liquidity of Class A shares resulting from the Proposed Transaction.

85.    *Fourth*, and finally, Hays is not retaining his Class B shares so that the Company can maintain a "moderate debt burden." The Company will not have a moderate debt burden if the Proposed Transaction is consummated. As noted above, the Company will be increasing its

debt load by 40 times. The Company will also have negative shareholders' equity.  Additionally, if Hays had any regard whatsoever for the Company's financial burden he would not be: (i) undertaking the Stock Swap, which costs the Company over $11 million and accounts for greater than 10% of the total transaction expense; and (ii) having the Company reimburse him for more than half-a-million-dollars in personal expenses.

86.    Hays's and the Board's clear effort to mislead shareholders regarding the purpose of the Proposed Transaction only underscores their disloyalty and bad faith.

## VI.    The NRC Board Issued Proxy Solicitation Materials That Fail to Disclose Material Information and Include Materially False, Misleading, and Downright Bizarre Statements

87.    Because the Board is soliciting shareholder approval of the Proposed Transaction, the Board is required to provide stockholders with all material information necessary to cast an informed vote.  The Board is also not permitted to mislead stockholders.

88.    The Proxy contains material misrepresentations, including the following:

(a)    The Proxy states the Proposed Transaction "will not affect holders of class B common stock differently on the basis of affiliate status";

(b)    The Proxy states the "[t]he sole determining factor in whether a shareholder will be cashed out or will continue as a holder of class B common stock as a result of the Proposed Transaction is the number of shares of class B common stock held by the shareholder immediately prior to the Proposed Transaction"; and

(c)    The Proxy states that the Proposed Transaction will allow the company to "maintain a moderate debt burden."

89.    The Proxy also contains material omissions, including the following:

    (a)    The Proxy fails to disclose management's financial projections, including cash flow projections, which would permit existing holders of Class B Stock to value their shares;

    (b)    The Proxy fails to identify the personal expenses for which the Board is reimbursing Hays;

    (c)    The Proxy fails to identify the shareholders that supposedly communicated concerns regarding the Company's dual-class stock structure to the Board;

    (d)    The Proxy fails to identify the meetings at which the Board supposedly considered alternatives to the Proposed Transaction, including a tender offer or sale of control; and

    (e)    The Proxy fails to inform NRC's shareholders that the Proposed Transaction will violate the Wisconsin Business Corporation Law, including its provisions concerning shareholder distributions and conflict of interest transactions.

## CLASS ACTION ALLEGATIONS

90.    Plaintiff brings this action, in part, as a class action on behalf of all holders of Class B Stock who have been or will be threatened with harm by the conduct described herein and their successors in interest (the "Class"). Excluded from the Class are the Defendants named herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants and their successors in interest.

91.    This action is properly maintainable as a class action.

92.     A class action is superior to other available methods of fair and efficient adjudication of this controversy.

93.     The Class is so numerous that joinder of all members is impracticable.  As of October 27, 2017, 3,540,244 shares of NRC Class B Stock were outstanding.  More than 35% of these shares are not affiliated with Defendants.  Consequently, the number of Class members is believed to be in the hundreds or thousands. Members of the Class are, moreover, likely located across the globe.

94.     There are questions of law and fact that are common to all Class members and that predominate over any questions affecting only individuals, including, but not limited to:

    (a)     Whether the Defendants have breached their fiduciaries duties to the Class by failing to pay fair value for the Class's shares of Class B Stock;

    (b)     Whether the Class will suffer irreparable harm if the Proposed Transaction becomes effective; and

    (c)     Whether the Class is entitled to injunctive relief and/or damages.

95.     Plaintiff's claims are typical of claims of other Class members and Plaintiff has no interests that are antagonistic or adverse to the interest of other Class members.  Plaintiff will fairly and adequately protect the interests of the Class.

96.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

97.     Defendants have acted in a manner that affects Plaintiffs and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

98.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## DERIVATIVE AND DEMAND ALLEGATIONS

99.     Plaintiff brings this action, in part, derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties and other violations of law.

100.    Plaintiff is a Class A and Class B shareholder of NRC, was a Class A and Class B shareholder of NRC at the time of the wrongdoing alleged herein, and has been a Class A and Class B shareholder of NRC continuously since that time.

101.    Plaintiff will adequately and fairly represent the interests of NRC and its shareholders in enforcing and prosecuting their rights.

102.    Concurrently with the filing of this Complaint, Plaintiff has served the Company with a written Shareholder Demand pursuant to Section 180.0742 of the Wisconsin Business Corporation Law.  Pursuant to Subsection 180.0742(2), Plaintiff is not required to wait 90 days before commencing derivative proceedings because the Proposed Transaction threatens irreparable injury to the corporation.

### CAUSES OF ACTION

### COUNT I
**Claim for Injunctive Relief**
**Against the Director Defendants for**
**Violation of Wisconsin Business Corporation Law § 180.0640**

103.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

104.    Plaintiff brings this claim directly on behalf of himself and the Class, and derivatively on behalf of NRC.

105.    The Proposed Transaction constitutes a "distribution" under section 180.0103(7) of the Wisconsin Business Corporation Law.

106.    Pursuant to section 180.0640(3)(b) of the Wisconsin Business Corporation Law, "[n]o distribution may be made if, after giving it effect . . . [t]he corporation's total assets would be less than the sum of its total liabilities . . ."

107.    The Proxy concedes that, after the Proposed Transaction is effected, NRC's total assets will be less than the sum of its total liabilities.  The Proposed Transaction, therefore, is an illegal transaction.

108.    If not enjoined by this Court, Defendants will cause NRC to violate Wisconsin law by effecting the Proposed Transaction.

109.    As a result of the foregoing, if the Proposed Transaction is not enjoined, Plaintiff, the Class, and NRC will suffer irreparable injury for which there is no adequate remedy at law.

110.    Injunctive relief is further warranted under section 180.0833 of the Wisconsin Business Corporation Law.

4:17-cv-03152-JMG-MDN   Doc # 1   Filed: 11/16/17   Page 30 of 35 - Page ID # 30

**COUNT II**

**Claim for Injunctive Relief
Against the Director Defendants to Void the Proposed Transaction Under
Wisconsin Business Corporation Law § 180.0831**

111.　Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

112.　Plaintiff brings this claim derivatively on behalf of NRC.

113.　The Proposed Transaction is a voidable conflict of interest transaction pursuant to Section 180.0831 of the Wisconsin Business Corporation Law because each Director Defendant has a direct and/or indirect interest in the transaction and none of the exceptions set forth in Subsection 180.0831(2) applies.

114.　If not enjoined by this Court, Defendants will cause NRC to violate Wisconsin law by effecting the Proposed Transaction, which is a voidable conflict of interest transaction.

115.　As a result of the foregoing, if the Proposed Transaction is not enjoined, NRC will suffer irreparable injury for which there is no adequate remedy at law.


**COUNT III**

**Claim for Money Damages
Against the Director Defendants for
Violation of Wisconsin Business Corporation Law § 180.0640**

116.　Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

117.　Plaintiff brings this claim derivatively on behalf of NRC.

118.　The Proposed Transaction constitutes a "distribution" under section 180.0103(7) of the Wisconsin Business Corporation Law.

119.    Pursuant to section 180.0640(3)(b) of the Wisconsin Business Corporation Law, "[n]o distribution may be made if, after giving it effect . . . [t]he corporation's total assets would be less than the sum of its total liabilities . . ."

120.    The Proxy concedes that, after the Proposed Transaction is effected, NRC's total assets will be less than the sum of its total liabilities.  The Proposed Transaction, therefore, is an illegal transaction.

121.    Each Director Defendant voted for and assented to the Proposed Transaction.

122.    Each Director Defendant's vote for and assent to the Proposed Transaction constituted conduct not protected from liability by section 180.0828 of the Wisconsin Business Corporation Law.

123.    If the Proposed Transaction is not enjoined, each Director Defendant will be personally liable to the corporation for money damages pursuant to section 180.0833 of the Wisconsin Business Corporation Law.

## COUNT IV

**Claim for Money Damages**
**Against Hays and the Hays Family Trust for**
**Breach of Fiduciary Duty**

124.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

125.    Plaintiff brings this claim directly on behalf of himself and the Class, and derivatively on behalf of NRC.

126.    Hays is NRC's controlling shareholder. His individual holdings give him the power to control the Company and any vote of Class B Stock.  Hays and the Hays Family Trust together control any vote of Class A Stock.

127.    As controlling shareholders, Hays and the Hays Family Trust owe NRC and its shareholders fiduciary duties.

128.    By reason of the foregoing, Hays and the Hays Family Trust have breached their fiduciary duties of good faith, fair dealing, and loyalty, by using their voting power to force corporate action that is unfair to NRC and its minority shareholders.

129.    NRC has suffered monetary damages as a direct and proximate result of Hays's and the Hays Family Trust's breaches of fiduciary duty.  If the Proposed Transaction is not enjoined, Plaintiff and the Class will suffer significant monetary harm, and the NRC will suffer further, significant monetary harm..

130.    As a result of the misconduct alleged herein, if the Proposed Transaction is not enjoined, Hays and the Hays Family Trust will be liable to Plaintiff, the Class, and NRC.

### COUNT V

**Claim for Money Damages**
**Against the Director Defendants for**
**Breach of Fiduciary Duty**

131.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

132.    Plaintiff brings this claim directly on behalf of himself and the Class, and derivatively on behalf of NRC.

133.    As directors of a Wisconsin corporation, the Director Defendants owe NRC and its shareholders fiduciary duties.

134.    By reason of the foregoing, the Director Defendants have breached their fiduciary duties of good faith, fair dealing, loyalty, in structuring and approving the Proposed Transaction.

135.    NRC has suffered monetary damages as a direct and proximate result of Hays's and the Hays Family Trust's breaches of fiduciary duty.  If the Proposed Transaction is not enjoined, Plaintiff and the Class will suffer significant monetary harm, and the NRC will suffer further, significant monetary harm.

136.    As a result of the misconduct alleged herein, if the Proposed Transaction is not enjoined, the Director Defendants will be liable to Plaintiff, the Class, and NRC.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

a.    Declaring that this action is properly maintainable as a class action, and certifying Plaintiff as representative of the Class;

b.    Finding the Proposed Transaction violates § 180.0640 of the Wisconsin Business Corporation Law;

c.    Enjoining the Proposed Transaction;

d.    Finding that Defendants are liable for breaching their fiduciary duties owed to the Class and the Company;

e.    Awarding monetary damages against Defendants for their breaches of their fiduciary duties owed to the Class and the Company;

f.    Awarding Plaintiff the costs, expenses, and disbursements of this action, including attorneys' and experts' fees; and

g.    Awarding Plaintiff and the Class such other and further relief as this Court may deem just, equitable, and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all issues triable.

Dated: November 16, 2017

By:    *s/ Blake E. Johnson*
        Blake E. Johnson, #24158
        David D. Cookson, #18681
        BRUNING LAW GROUP
        1201 Lincoln Mall, Suite 100
        Lincoln, NE 68508
        Telephone: (402) 261-3475
        Facsimile: (402) 261-4517
        blake@bruninglawgroup.com
        david@bruninglawgroup.com

        **LABATON SUCHAROW LLP**
        Ned Weinberger, *Pro Hac Vice Pending*
        Mark Richardson , *Pro Hac Vice Pending*
        Thomas Curry, *Pro Hac Vice Pending*
        300 Delaware Avenue
        Suite 1340
        Wilmington, DE 19801
        (302) 573-2530

        *Attorneys for Plaintiff*

## VERIFICATION

I, James D. Gerson, hereby verify that I have authorized the filing of the attached Shareholder Class Action and Derivative Complaint (the "Complaint"), that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 15 2017

James D. Gerson